2024 BNH 003        Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | Bk. No. 23-10309-BAH |
| | Chapter 7 |
| Patrick J. Mulcahy, | |
|     Debtor | |
| | |
| State of New Hampshire | |
| Department of Employment Security, | |
|     Plaintiff | |
| | |
| v. | Adv. No. 23-1013-BAH |
| | |
| Patrick J. Mulcahy, | |
|     Defendant | |

*Walter L. Maroney, Esq.*
*State of New Hampshire*
*Department of Employment Security*
*Attorney for Plaintiff*

*Gerald D. Neiman, Esq.*
*Gerald D. Neiman, Attorney at Law, PLLC*
*Attorney for Defendant*

## MEMORANDUM OPINION

### I.  INTRODUCTION

The State of New Hampshire Department of Employment Security (the "Department" or "NHES") filed a two-count complaint (Doc. No. 1) (the "Complaint") seeking to except from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) and/or (B) the Debtor's obligation to repay the Department $31,623.50 in unemployment compensation, which NHES contends was fraudulently obtained by the Debtor.  The Court held a trial on the Complaint at which the Debtor and Brian Riley, a fraud investigator with the Department, testified.  At the

commencement of the trial, NHES withdrew Count II of the Complaint, which sought to except the debt from discharge pursuant to § 523(a)(2)(B).  Accordingly, the Court must decide only whether the debt should be excepted from discharge pursuant to § 523(a)(2)(A).

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  FACTS

NHES is an agency of the State of New Hampshire and, pursuant to NH RSA 282-A, is responsible for administering all state laws regarding unemployment compensation, including the collection of debts for overpayment of unemployment compensations benefits.  Pursuant to provisions of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), and other federal action, individuals were permitted to seek various unemployment benefits under federal law during the coronavirus disease 2019 (COVID-19) pandemic.  NHES reports that state governments were responsible for administering these benefits, including recovering any benefits that were obtained fraudulently.[1]

---

[1] The CARES Act at 15 U.S.C § 9021 governs the Pandemic Employment Assistance ("PUA") program.  The CARES Act at 15 U.S.C. § 9023 governs the Federal Pandemic Unemployment Compensation program.  Lost Wage Assistance ("LWA") benefits were governed by a Presidential Memorandum Authorizing the Other Needs Assistance Program for Major Disaster Declarations Related to Coronavirus Disease 2019, issued on August 8, 2020.  Under guidance issued by the United States Department of Labor ("DOL"), "quitting work without good cause to obtain UI [unemployment insurance] benefits is fraud under PUA.  Specifically related to PUA, 20 C.F.R. 625.14 governs overpayments and disqualifications for fraud.  States are expected to enforce this provision."  Unemployment Insurance Program Letter (UIPL) 16-20 (April 5, 2020), ¶ 3.c, at p. 2.  With respect to LWA benefits, the DOL explained that "[t]he State is responsible for recovering assistance awards from applicants obtained fraudulently, expended for unauthorized items or services, expended for items for which assistance is received from other means, and awards made in error."  44 C.F.R. 206.120(f)(5); see also Unemployment Insurance Program Letter (UIPL) 27-20, Change 1 (August 17, 2020), Attachment I, Question 22, at p. I-7.

2

In March 2020, the Debtor was employed part-time by the United States Postal Service (the "USPS"), working as a mail carrier for the Weare Post Office. According to the USPS, on March 17, 2020, the Debtor called out sick.[2] He was next scheduled to work on March 25, 2020, and called out again, again using unscheduled sick leave. The Debtor did not appear for his next scheduled workdays on March 26, 2020, March 27, 2020, March 31, 2020, and April 1, 2020, and used annual leave for his time out. On April 3, 2020, the Debtor was scheduled to work but did not work. Because he had run out of leave, his status for the day was leave without pay. The Debtor was supposed to return to work on April 4, 2020, but informed an employee at the USPS that he had been exposed to COVID-19. The USPS placed the Debtor on paid COVID-19 leave for the period April 4, 2020, to April 24, 2020. Thereafter, the Debtor was out again for COVID-19 reasons. During the trial, the Debtor testified that during this time he had respiratory symptoms, which may have been the result of allergies and not COVID-19. He stated that the USPS told him to "stay out" of work until he could be cleared. He also testified that he could not get cleared by a doctor because he was unable to be seen by a medical care provider during that time. The USPS reported that when its employees telephoned the Debtor about his obtaining a negative COVID-19 test so he could return to work, the Debtor did not return their calls.

On June 10, 2020, the Debtor was cleared by the USPS's nurse to return to work, but he failed to do so. On June 12, 2020, the Debtor informed the USPS that his vehicle was not working. He was given until June 20, 2020, to return to work. The Debtor did not return to work that day.

---

[2] The Court takes judicial notice that on March 13, 2020, the President of the United States declared a national emergency concerning the COVID-19 pandemic. The Governor of New Hampshire similarly declared a state of emergency for New Hampshire on that same date.

On July 2, 2020, the USPS sent the Debtor a letter of warning based on the Debtor's failure to satisfactorily perform his work duties. On July 7, 2020, the USPS sent the Debtor a letter scheduling a pre-discipline interview ("PDI") for July 14, 2020, regarding his unscheduled absences that began on June 20, 2020. The Debtor did not appear for the interview. On July 14, 2020, the USPS sent the Debtor another letter scheduling a second PDI for July 23, 2020, based on the Debtor's failure to work since June 20, 2020. The Debtor did not appear for this second interview. Thereafter, the USPS issued the Debtor a seven-day suspension based on his failure to be in regular attendance at work. On August 21, 2020, the USPS sent the Debtor a letter scheduling a third PDI for August 26, 2020, based on his failure to work during the period July 25, 2020, through the date of the letter. The Debtor did not appear for this third interview.

On October 19, 2020, the USPS issued the Debtor a letter informing him that he would be removed from his job with the USPS based on his failure, beginning August 27, 2020, to be in regular attendance at work.[3] This notice of removal gave the Debtor fourteen days to file a grievance with the USPS. The Debtor did not file a grievance. The notice also informed the Debtor that he would be in pay status for a 30-day period commencing October 20, 2020. The Debtor was then paid four weeks of administrative leave for the period of October 20, 2020, through November 17, 2020. The Debtor was involuntarily separated from the USPS effective November 21, 2020.

From November 21, 2020, through April 2021, the Debtor remained unemployed. On April 12, 2021, he started working for Gordon Services Property Maintenance LLC ("Gordon Services"). He received his first paycheck in the amount of $630.00 on April 22, 2021.

---

[3] By this point, the Debtor had been absent without leave from June 20, 2020, to October 17, 2020.

4

All this while, from March 2020 through April 2021, the Debtor filed weekly claims for unemployment compensation benefits with NHES, and received benefits. On April 1, 2020, the Debtor submitted his initial claim application with the Department, stating he had been employed by the USPS from July 17, 2018, through March 20, 2020. He listed the reason for his separation as "Corona Virus Related" with the detailed reason being "Self-imposed quarantine." He stated in the application that he had "No Definite Return to Work Date" and that he did not expect any money to be received from his employer due to his separation. He requested that his employment benefits be paid to him by paper check. Before submitting his initial claim application, the Debtor certified that "the information provided is complete and correct." He further certified that he was "partially or totally unemployed." He acknowledged that RSA 282-A:161-164 provides "civil and criminal penalties for false statements made to obtain benefits."

On April 2, 2020, NHES provided the Debtor with a "New Claim Instruction Sheet," which advised the Debtor as follows:

> It is important to provide accurate information and to answer each question on your application and in all communications with this department truthfully. The law provides for penalties for false statements made to obtain or increase benefits.
> …
>
> You must report any and all work and earnings for any week you file for benefits. … Penalties exist for providing false information.
> …
>
> Willfully false statements, misrepresentations or knowingly failing to disclose information that results in undeserved benefits paid can have serious consequences. If you lie or hide information to receive or increase benefits paid to you, you may face civil penalties and/or be criminally prosecuted, which may include jail time.

On that same date, the Debtor began submitting continued claim applications to NHES on a weekly basis. Each continued claim application required the Debtor to certify that his statements in the application were "true and correct." He also was required to certify that he had not "previously provided false information or failed to disclose information about employment

history, employment status, earnings, availability for work, or other matters concerning [his] eligibility for benefits." He also acknowledged that RSA 282-A:161-164 provides "civil and criminal penalties for false statements made to obtain benefits."

The Debtor did not report to the Department that he received monies from the USPS while he was on paid leave from the USPS during March and April of 2020, despite being asked whether he had received "any monies not previously reported to this department, other than wages for hours actually worked" in the past week. Starting with the continued claim applications made on April 12, 2020, and thereafter, the Debtor at various times indicated that the reason he was not currently able and available to work was COVID-19 related. At least twenty-eight times, for continued claim applications submitted for weeks ending May 16, 2020, through November 21, 2020, the Debtor indicated that he had COVID-19 for the week for which he was seeking benefits, or "experience[d] symptoms and [sought] a medical diagnosis." He testified that at various times household members had been exposed to COVID-19 and that he had symptoms here and there. He did not testify that he was under the care of any medical providers for his symptoms, nor did he indicate that he suffered from long-term symptoms of COVID-19.

For the week ending November 28, 2020, the Debor <u>for the first time</u> since the claim submitted on April 12, 2020, did not indicate that he had COVID-19 or was experiencing symptoms. The Court notes that this coincides with the Debtor's November 21, 2020, involuntary separation from the USPS. Thereafter, the Debtor continued to indicate that COVID-19 was the reason for seeking unemployment benefits, including that he was "caring for [his] child or other person for whom [he] ha[d] primary care-giving responsibility because their school or care facility is closed because of COVID-19." The Debtor testified that his son was age twelve or thirteen in 2020, and that his son's school was open and closed numerous times

6

during the pandemic due to COVID-19. He further testified that his son needed assistance with his schoolwork.

On February 21, 2021, in response to a newly worded question on the continued claim application, the Debtor stated that he "had to quit my job as a direct result of COVID-19." The Debtor submitted his last continued claim application on April 18, 2021. He admitted at trial that he made a mistake in submitting his last continued claim application because he had obtained a job with Gordon Services and was not entitled to unemployment compensation benefits for that week.

For weeks ending March 28, 2020, through April 17, 2021, the Debtor was paid benefits totaling $29,108.00. The Department paid $27,308.00 as PUA benefits and $1,800.00 as LWA benefits pursuant to provisions of the CARES Act and another federal program.

On May 14, 2021, NHES began investigating the Debtor's unemployment claims. NHES sent the Debtor a letter outlining the Department's contention that the Debtor was ineligible for benefits. The Debtor was given seven days to respond to this pre-determination notice. The Debtor failed to respond. On September 14, 2021, NHES sent the USPS a letter indicating it was conducting an audit of the Debtor's unemployment compensation record and requested confirmation that the Debtor was employed and earning wages within the period of March 22, 2020, through November 28, 2020. The USPS responded to NHES's audit inquiry letter on September 17, 2021, confirming the Debtor's employment with the USPS and providing copies of an absence analysis report as well as letters sent to the Debtor, including those providing a warning, notice of his suspension, requesting PDIs, and ultimately his removal from service. On September 14, 2021, NHES also contacted Gordon Services, which confirmed that it hired the Debtor on April 12, 2021, and paid him $630.00 on April 22, 2021.

On October 19, 2021, NHES issued the "Decision of Commissioner," which recited that the Debtor voluntarily quit by abandoning his job at the USPS, effective March 16, 2020, and that he worked for Gordon Services and earned wages during the week ending April 17, 2021. The decision stated:

> You knowingly failed to report that you voluntarily quit the U.S. Postal Service effective 03/16/2020. You knowingly failed to report your work and earnings from Gordon Services Property Maintenance LLC during the week ending 04/17/2021. You knowingly failed to report these activities for the purposes of obtaining or increasing unemployment benefits for the weeks covered above. The weeks at issue are denied.
> …
> You are overpaid benefits in the amount of $29,108.00, plus a 20 percent penalty on applicable weeks of $5,461.60 for a total overpayment of $34,569.60 and restitution is required.

The Debtor was informed that he could appeal this determination and have the opportunity for a hearing. He was advised that his appeal needed to be postmarked or received in an NHES office within fourteen days, or no later than November 2, 2021.

NHES did not receive an appeal from the Debtor. The Debtor testified that he thought he did what he needed to do to file an appeal, but that he did not own a computer and submitted his claims on his cell phone. Because no timely appeal was filed, the Decision of the Commissioner became final on November 2, 2021.

The Debtor testified that he did not recall receiving most of the correspondence that the USPS sent to him while it was pursuing disciplinary action against him as outlined above. He did not recall getting a letter informing him that he had been dismissed or fired from the USPS. During this same period in 2020 and 2021, the Debtor received his weekly unemployment payments by paper check through the mail. No evidence was presented that the Debtor did not receive his benefit checks, which were mailed to the same address as the USPS correspondence. The Debtor testified further that it was appropriate to be out of work during this time because

there was a pretty consistent flow of exposure to COVID-19 between his girlfriend (who worked with the elderly as a caregiver) and his son. In addition, his son's school was closed for periods of time. In his opinion, the statements he made in his unemployment claim applications were truthful.

On June 13, 2023, the Debtor filed a chapter 7 bankruptcy petition. He listed NHES as an unsecured creditor with a debt of $31,461.00. On October 11, 2023, the Department filed its Complaint seeking to except $31,623.50[4] from discharge pursuant to § 523(a)(2).

### III. DISCUSSION

The Court must determine whether the Debtor's $31,623.50 debt to NHES for overpaid unemployment compensation is dischargeable within the meaning of § 523(a)(2)(A). Section 523(a)(2)(A) provides in relevant part:

> A discharge under section 727 … of this title does not discharge an individual debtor from any debt … for money, property, services . . . to the extent obtained by … false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

The United States Supreme Court stated in <u>Bartenwerfer v. Buckley</u>, 598 U.S. 69, 82 (2023), "[s]ection 523(a)(2)(A) take the debt as it finds it." Under state law, the Decision of the Commissioner is not subject to collateral challenge.[5] However, that does not mean that this

---

[4] This amount includes $29,108.00 in overpaid benefits, $5,461.60 in penalties, and $360.00 in interest, less a payment of $3,306.10 made by the Debtor in April 2022.

[5] NH RSA 282-A:68 provides "[t]he judicial review provided by RSA 282-A:67 shall be exclusive of all other methods of judicial review of unemployment compensation decisions, including extraordinary writs, including the writ of certiorari. No unemployment compensation decision shall be questioned, invalidated, vacated, set aside, suspended, or otherwise impeached by any court or other tribunal except in accordance with the provisions of this section and RSA 282-A:67."

9

Court must find that collateral estoppel, or issue preclusion, is applicable here[6] as the Debtor did not appear or participate in NHES's administrative proceeding.  Riley testified that he conducted an investigation and issued the Decision of Commissioner, all without obtaining any information from the Debtor himself.  For that reason, the Court must examine the evidence presented at trial to determine whether the Debtor fraudulently obtained unemployment benefits from NHES such that his debt to the Department should be excepted from his discharge pursuant to § 523(a)(2)(A).

In order to establish that the Debtor's obligation to the Department is nondischargeable under § 523(a)(2)(A) due to a false representation, NHES must show:

    1.  the Debtor made a knowingly false representation or one made in reckless disregard of the truth,
    2.  the Debtor intended to deceive,
    3.  the Debtor intended to induce NHES to rely upon the false statement,
    4.  NHES actually relied upon the false statement,
    5.  NHES's reliance was justifiable, and
    6.  the reliance upon the false statement caused damage.

---

[6] Courts have held that "[t]he ordinary rules of collateral estoppel and res judicata apply in most actions in the bankruptcy court, including adversary proceedings under § 523(a) to except debts from discharge." McCory v. Spigel (In re Spigel), 260 F.3d 27, 33 (1st Cir. 2001) (citing Grogan v. Garner, 498 U.S. 279, 284 n.11 (1991); FDIC v. Shearson-American Express, Inc., 996 F.2d 493, 497 (1st Cir. 1993)); see Backlund v. Stanley-Snow (In re Stanley-Snow), 405 B.R. 11, 18 (B.A.P. 1st Cir. 2009); Chapman v. Tracey (In re Tracey), 250 B.R. 468, 471 (Bankr. D.N.H. 2000).  Bankruptcy courts must look to state law to determine the preclusive effect of a prior state court judgment.  Spigel, 260 F.2d at 33 (citing New Hampshire Motor Transp. Ass'n v. Town of Plaistow, 67 F.3d 326, 328 (1st Cir. 1995)); Stanley-Snow, 405 B.R. at 18 (citing Marrese v. Am. Academy of Orthopaedic Surgeons, 470 U.S. 373 (1985) (stating the "full faith and credit" statute of 28 U.S.C. § 1738 "directs a federal court to refer to the preclusion law of the State in which the judgment was rendered.")).  Because the Decision of the Commissioner was issued in New Hampshire, the Court must look to New Hampshire law to determine its preclusive effect.  In New Hampshire, for collateral estoppel (or issue preclusion) to apply, a court must determine that "(1) the issue subject to estoppel must be identical in each action; (2) the first action must have resolved the issue finally on the merits; (3) the party to be estopped must have appeared in the first action or have been in privity with someone who did; (4) the party to be estopped must have had a full and fair opportunity to litigate the issue; and (5) the finding must have been essential to the first judgment." Farm Family Mut. Ins. Co. v. Peck, 143 N.H. 603, 605 (1999).

Whitcomb v. Smith, 572 B.R. 1, 15 (B.A.P. 1st Cir. 2017) (citing Sharfarz v. Goguen (In re Goguen), 691 F.3d 62, 66 (1st Cir. 2012)).  NHES must prove each element by a preponderance of the evidence.  Grogan, 498 U.S. at 291.

      With respect to the first element, it is clear that the Debtor repeatedly made false representations in the claim applications he filed with the Department.  The Debtor asserted in his initial claim application and repeatedly in his continued claim applications that the statements he was making were "complete," "true," and "correct."  The Debtor recited that he was "unemployed," without ever advising the Department that he was in fact employed by the USPS (at least until his termination effective November 21, 2020) or that he had received various pay between March 2020 and November 2020, including sick leave pay, annual leave pay, COVID-19 leave pay, and finally administrative leave pay.  The Debtor never advised NHES that he had voluntarily abandoned his job at the USPS effective March 16, 2020.  He incredulously testified that he did not recall receiving any letters in the mail from the USPS requesting PDIs or informing him that he had been suspended and ultimately terminated, even though he received the checks that NHES mailed to him at that same address.  Further, while the Debtor repeatedly indicated in the continued claim applications over the course of more than six months that he "experience[d] symptoms and [sought] a medical diagnosis," during the trial he testified merely that he had been exposed to COVID-19 off and on during that time and that many of his symptoms were consistent with allergies.  The Debtor also admitted that his last continued claim application was incorrect as he had begun a new job with Gordon Services by that date.  Considering this altogether, the Cour concludes that at minimum the Debtor made false statements in reckless disregard of the truth.

      NHES must next establish that the Debtor intended to deceive the Department.  "Because the intent to defraud is rarely proven by direct evidence, courts assess this element using a

totality of the circumstances approach to discern the debtor's subjective intent." Whitcomb, 572 B.R. at 15.  Intent to deceive may be established by showing that the Debtor "(a) knows or believes that the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation that he states or implies; or (c) knows that he does not have the basis for his representation that he states or implies." N.H. Dep't of Emp't Sec. v. Hudson (In re Hudson), 2017 BNH 018, at 13-14 (citing Palmacci v. Umpierrez, 121 F.3d 781, 787 (1st Cir. 1997) (quoting Restatement (Second) of Torts § 526)).  "[I]n many cases, the same facts will establish both the debtor's knowledge or recklessness as to the falsity of his representation and his intent to deceive." Hudson, 2017 BNH 018, at 14 (citing Bellas Pavers, LLC v. Stewart (In re Stewart), MB 12-017, 2012 WL 5189048 at *8 n.4 (B.A.P. 1st Cir. Oct. 18, 2012) (citing Boyuka v. White (In re White), 128 Fed. Appx. 994, 998 (4th Cir. 2005))).

      Here, as outlined above, the Debtor must have known that he voluntarily abandoned his job at the USPS.  The Debtor testified at trial that in the early days of the pandemic he was in contact with the USPS about his reasons for being absent from work.  He testified that he was in communication with a nurse at USPS about obtaining a negative COVID-19 test.  The Debtor must have known that he was continuing to receive various types of pay during March and April (sick leave, annual leave, COVID-19 leave) and yet he failed to acknowledge that on his continued claim applications.  The Debtor must have known that he was not unemployed due to COVID-19 because when the USPS contacted him in June he indicated that he could not come to work due to car trouble.  And to the extent he claimed to be out of work because he needed to assist his son with schoolwork when his son's school was closed, during the summer of 2020 his son would have been out of school.  Further, with respect to the overpayment of $630.00 based on his failure to report his Gordon Services employment, the Debtor admitted he should not have submitted that claim.  Thus, based on the totality of these circumstances, the Court finds that the

Debtor had to have known that his statements on his claim applications were not as he represented them to be, and therefore the Court finds that he intended to deceive the Department.

The Court finds further that the Debtor also intended to induce NHES to rely on his false statements. The Court cannot conceive of any other reason for the Debtor to have made these false statements in the claim applications other than to obtain unemployment benefits.

The Court also finds that NHES actually relied upon the false statements and that its reliance was justifiable. Riley testified that it was important for the Department to receive full and accurate information as it relies on claimants' responses in determining whether the claimant is eligible to receive unemployment benefits. That information includes the reason for a claimant's separation from employment, whether they earned income during the applicable period, and if so, how much. According to Riley, false information can result in a claimant getting paid benefits for which the claimant is not entitled. Further, the Debtor would not have been eligible for benefits for the week ending April 17, 2021, as he was employed that week earning wages.

Riley testified that in almost all of the Debtor's continued claim applications, the Debtor cited COVID-19 as the reason for his unemployment and certified that these claims were true and accurate. The Debtor failed to advise NHES at any time that he was under disciplinary review at the USPS or that he had been terminated. Riley testified that if NHES knew the real reason for the Debtor's separation from the USPS, he would not have been eligible for benefits as he was not out of work due to COVID-19. Instead, the Debtor was out of work because he abandoned his job on March 16, 2020.

Lastly, the Court concludes that NHES's reliance upon the Debtor's false statements caused it damage. The Debtor repeatedly made a series of false statements on each of his claim applications that would have disqualified him from receiving unemployment benefits. Because

13

the Debtor would have been disqualified from receiving any payments, NHES suffered an injury when it paid the Debtor benefits between March 2020 and April 2021. Accordingly, the Court finds that NHES has met its burden and established that the obligation set forth in the Decision of the Commission should be declared nondischargeable pursuant to § 523(a)(2)(A).

### IV. CONCLUSION

In the Debtor's view, his conduct was not fraudulent but rather reasonable under the circumstances of the COVID-19 pandemic. The Debtor's conduct was not reasonable. While the Court acknowledges that the pandemic was a scary and uncertain time, when the Debtor applied for unemployment compensation benefits, his employment had not been terminated by the USPS. Rather, the Debtor chose not to work. And, for some time, he continued to collect various forms of pay from the USPS (including paid COVID-19 leave) while simultaneously indicating he had not received any money from the USPS. The Debtor's actions resulted in his receiving unemployment benefits to which he was not entitled under state and federal law.

For the reasons set forth in this opinion, the Court concludes that the Debtor's $31,623.50 debt to NHES is nondischargeable pursuant to § 523(a)(2)(A). This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate judgment in favor of the Department with respect to Count I of the Complaint.

ENTERED at Concord, New Hampshire.

Date: May 16, 2024         /s/ Bruce A. Harwood
                           Bruce A. Harwood
                           Chief Bankruptcy Judge